NEW HAVEN STEAM SAW-MILL Co. *v.* SECURITY INS. Co.*

*(Circuit Court, D. Connecticut.   January 6, 1881.)*

1. MARINE INSURANCE—POLICY CONSTRUED.

In a printed policy of insurance the assured warranted " not to use ports and places in Texas, except Galveston ; nor foreign ports and places in the Gulf of Mexico." On the margin was written the following: " To be employed in the coasting trade on the United States Atlantic coast ;" and underneath, also in writing, the words " Permitted  *  *  *  to use gulf ports not west of New Orleans." The vessel was lost in the Gulf of Mexico, west of New Orleans, while on a voyage from Maine to Morgan City, Louisiana, a place west of New Orleans. *Held*, that when the loss occurred the vessel was on a voyage not permitted by the policy.   Libel dismissed.

In Admiralty.

*H. Stoddard, L. H. Bristol,* and *C. R. Ingersoll,* for libellant.

*J. W. Alling,* for respondent.

BLATCHFORD, C. J.   This is a libel in admiralty, filed in the district court, to recover $3,000, the sum insured by a valued marine policy of insurance issued by the respondent to the libellant, insuring the schooner Tannhauser for one year from January 28, 1880. The policy is a printed form, filled up with writing, and containing additional written clauses.   It contains the following clauses wholly in print :

"Warranted by the assured not to use ports on the continent of Europe north of Hamburg, nor the Mediterranean east of the Ionian islands, during the period insured; nor ports on the continent of Europe north of Antwerp between first of November and first of March; nor ports in the British North American provinces, except between the fifteenth day of May and fifteenth day of August; also warranted not to use the West India islands during the months of August and September; also warranted not to use ports and places in Texas, except Galveston; nor foreign ports and places in the Gulf of Mexico; nor places on or over Ocracoke bar; nor any of the West India salt islands; nor ports or places on the west coast of America, north of Benicia; nor to use the Min river, nor Torres straits, during the period insured." "Also warranted not to load more than her registered tonnage with lead, marble, coal, slate, copper ore, salt, stone, bricks, grain, or iron, either or all, on any one passage."

On the margin of the face of the policy, written at a right angle to the printed lines, are these words: *"To be employed in the coasting trade on the United States Atlantic coast,"* in one line.   Underneath that line, and in one line parallel with it, are these written words :

*See 7 FED. REP. 847, for the opinion delivered by the court below.

"Permitted to carry grain and heavy cargoes over tonnage on coastwise voyages, and to use gulf ports not west of New Orleans." The libel claims for a total loss of the vessel by the perils of the seas, while on a coastwise voyage within the policy. The answer denies that the voyage was within the policy, and avers that at the time of the loss the vessel was not on a voyage within the terms of the policy, but was by the voluntary act of the master and owners on a voyage to a port in the Gulf of Mexico west of New Orleans, to-wit, the port of Morgan City, state of Louisiana, and not upon any voyage protected by the terms of the policy, and at the time of her destruction was upon that part of her voyage to Morgan City which was west of the port of New Orleans, and so known to her master, and she stranded on the shore of the Gulf of Mexico, west of the port of New Orleans, because her master mistook, in taking his course to the port of Morgan City, the light on Timbalier island for the Ship Shoal light, both of which lights were west of the port of New Orleans. The proof in the case consists entirely of the following written stipulation, entitled in the suit, and signed by the proctors for the respective parties while the suit was pending in the district court, and of the documents referred to in the stipulation:

"We hereby mutually stipulate and agree that the following are the facts applicable to the issues presented by the pleadings in the above-entitled cause, and consent that this stipulation and the statement of facts forming part thereof shall be entered and filed as the finding of the court as to the facts in said cause: On the fourth of February, A. D. 1880, the Security Insurance Company, acting within the scope of its corporate capacity, executed and delivered to the New Haven Steam Saw-Mill Company the valued policy of insurance for $3,000, upon said mill company's interest in the schooner Tannhauser, a copy of which policy is annexed to the libel in said cause, and marked exhibit A, and said policy is itself referred to and made part of this agreement and finding, a *verbatim* copy of which is appended and marked A. On the eleventh of June, 1880, the said schooner Tannhauser, while on a voyage from the port of Rockland, in the state of Maine, to Morgan City, known on the United States coast survey map of 1870 as Brashear, in the state of Louisiana, went ashore and was wrecked on a reef in the Gulf of Mexico, west of the port of New Orleans, and was totally destroyed by the perils of the seas. That the statement set forth in the proofs of loss filed with said insurance company, and being the marine protest of the master and crew of said vessel, are true so far as any issue in this cause is concerned, and said protest and the statement therein contained are hereby made part and parcel of this stipulation and finding, and annexed hereto, marked Exhibit B. It is hereby mutually agreed that maps or charts may be referred to for the purpose of defining and determining the location of the spot where said vessel was

lost, and of any place or locality referred to in said policy or proof of loss. That proper proofs of loss were filed with the insurance company in due season, and that the libellant is entitled to recover upon said policy the amount insured thereby, (less the note of $301, given for the premium on said policy) with interest from the ———— day of ————, unless the law is so that upon the facts set forth in this finding said libellant is not entitled to recover, in which case judgment is to be entered for said respondent."

The protest states that the vessel left Rockland on May 17th, with a cargo of ice, bound for the port of Morgan City, Louisiana; that for two days before June 11th they had not been able to take an observation, on account of cloudy and hazy weather; that during the evening of the 11th they sighted a light which they took for Ship Shoal light, and kept on their course accordingly, but at 10:30 o'clock P. M. the vessel suddenly took the ground; that they immediately let go an anchor, but the vessel soon began to leak, and the ice to melt from contact with the gulf water, and in a short time she had filled and rolled over, so that pumping was useless; that the next day they discovered that the light they saw the evening before was not Ship Shoal light, but the light on Timbalier island, and that the vessel was ashore on a reef about two miles from Vine island, and about 15 miles from Timbalier island; and that the vessel is a total loss.

The district court dismissed the libel. It appears from the decision of that court that the libellant there contended that "the coasting trade on the United States Atlantic coast" meant trade from Maine to Texas; that the written permission to use ports in the Gulf of Mexico not west of New Orleans, meant, in view of the printed restriction against using foreign ports in that gulf, a permission to use foreign ports in that gulf not west of New Orleans; that if the vessel was prohibited from using any gulf ports west of New Orleans, she was not using any such port at the time of the disaster; and that an intent to use a prohibited port did not avoid the policy. The court held that the meaning of the two written clauses in the policy was that the vessel was to be employed on the United States Atlantic coast, which was the coast of the Atlantic ocean and not the coast of the Gulf of Mexico, but that if necessity or occasion required she was to be permitted to go into the Gulf of Mexico and use the ports not west of New Orleans; but not that her coasting trade was to be thereby extended through the gulf; and that when she was engaged in transporting a cargo from Maine to Morgan City she was not in

the Atlantic coasting trade, but upon a voyage outside of, the terms of the contract. The view of the court was that if the coasting trade was to be through the gulf the permission to use ports in the gulf was unnecessary; and if the coasting trade upon the United States Atlantic coast necessarily implied voyages through the gulf, a permit to use any gulf ports not west of New Orleans was unnecessary, as those United States gulf ports had not been excluded in the printed part of the policy; that the fact that the vessel was to be a coaster on the United States Atlantic coast, coupled with a permit to use certain ports in the gulf, indicated that without the permit the vessel could not go into the gulf; and that the permit apparently enlarged the previous limitation, especially as domestic ports not west of New Orleans had not been excluded.

The case for the libellant is argued in this court upon grounds apparently not urged in the court below. There are in the printed clauses of the policy many warranties, above cited by the assured, not to use (1) certain ports and places; (2) certain waters. There are also printed warranties, above cited by it, against loading more than the registered tonnage of the vessel with heavy cargoes, including grain. The printed form is a blank from a purely time policy, under which the vessel would have a right to go anywhere, except as prohibited by the warranties not to use the ports, places, and waters specified as forbidden. Then, on the margin, are the two written lines which control. The first line relates to voyages. It purports to specify voyages. It is enabling and permissive. It declares that the vessel is "to be employed in the coasting trade on the United States Atlantic coast." It is an affirmative statement of voyages. It means that the vessel is to be employed in those voyages only. Both parties so declare. This, in connection with the time clause, one year, makes the policy a mixed policy, specifying both time and voyages. Then follows the second written line. It is a permission. It begins with the word "permitted." That word qualifies the entire line. Naturally, we should expect to find in such permission something permitted which was not permitted by the preceding printed and written clauses; whether something merely not before permitted, or something before actually prohibited. Accordingly, the first thing permitted is a permission "to carry grain and heavy cargoes over tonnage on coastwise voyages." This had before been prohibited in the clause above cited from the printed clauses. Then follows, in the same sentence, under the word "permitted," and after a comma, the

words "and to use gulf ports not west of New Orleans." The word "and" is a copulative. It makes of the second branch of the sentence a permission, and that branch is to be read as if the word "permitted" was inserted between "and" and "to." The use of gulf ports in the United States, not west of New Orleans, had not been prohibited by the printed clauses. But then came in the first written line, declaring affirmatively what the voyages should be. As the use of gulf ports in the United States, not west of New Orleans, was not forbidden by the printed clauses, the special permission in the second written line to use them was wholly useless, if the use of them was allowed by the words in the first written line, "the coasting trade on the United States Atlantic coast." These last words must be construed as not including voyages to gulf ports not west of New Orleans, in order to make the two sentences symmetrical.

For the purpose of supporting the view that "the coasting trade on the United States Atlantic coast" includes coasting trade in the gulf up to the line of Mexico, and that the vessel was on a voyage in such trade, the advocate for the libellant contends in this court that the words "and to use gulf ports not west of New Orleans" are to be read as if they were "and not to use gulf ports west of New Orleans," so as to make of it a warranty not to use ports west of New Orleans, and a warranty not broken because no such port was used, while the voyage was a lawful one because in a permitted coasting trade. This is ingenious but not sound. "Permitted not to use" is not a form of expression that any person of intelligence would use. There are two permissions in the sentence. One is to carry something; the other to use something. The right to carry the thing so permitted was prohibited but for the permission. The right to use the thing so permitted was not within the coasting trade allowed, but for the permission. Both of the written lines in regard to voyages refer to the subject-matter of the insurance. If the vessel, when lost, was not employed in the coasting trade on the United States Atlantic coast, and was not availing herself of the permission to use gulf ports not west of New Orleans, the risk was not covered by the policy.

The voyage clauses must be held to mean that the vessel was to be employed in the coasting trade on the United States Atlantic coast proper, excluding the gulf, but with the added permission that she might use ports in the gulf not west of New Orleans, and might enter the gulf for the purpose of proceeding to such ports with a view to use them. A voyage in the gulf west of New Orleans, with a view

to proceed to and to use a United States gulf port west of New Orleans, and a loss west of New Orleans, on such voyage, was not a risk within the permitted voyages of the policy. There was no way, under the policy, by which the vessel could enter the gulf, consistently with the first written line, except by the permission in the second written line, and that permission gave her no right to be west of New Orleans on a voyage to Morgan City. There is a clear intention manifested and expressed by the words of the policy of not insuring against the perils of a coasting trade on the gulf coast west of New Orleans, or against the perils of trying to enter a United States gulf port west of New Orleans.

The case of *Snow* v. *Columbian Ins. Co.* 48 N. Y. 624, was the case of a purely time policy, not prescribing any voyage or trade, and having warranties against using certain ports, places, and waters. One of them was a warranty not to use ports in the British North American Provinces except between certain days. The vessel, at a time not between those days, sailed for a port in a British North American province, and was lost on the coast of that province, about 50 miles from that port, at a time not between those days. It was held that the insurer was liable, as there had been no use of the forbidden port. The decision was put on the ground that the vessel had a right to be in the water where she was. In the present case, on a proper construction of the policy, the vessel was sailing in forbidden waters.

The case of *Palmer* v. *Warren Ins. Co.* 1 Story, 360, was the case of an exception or exclusion of what would otherwise have been included in the general terms of the policy. It differed from the present case. Moreover, the policy was purely a time policy, with no designation of prescribed or permitted voyages or trade.

The libel is dismissed, with the costs of the respondent in the district court, taxed at $20, and costs of the respondent in this court.